T.C. Memo. 1997-43


UNITED STATES TAX COURT


PETER S. PAU AND SUSANNA H. PAU, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 20475-94.               Filed January 27, 1997.


<u>John M. Youngquist</u>, for petitioners.

<u>Patricia Anne Golembiewski</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, <u>Judge</u>:  Respondent determined a deficiency in and a penalty on petitioners' 1990 Federal income tax as follows:

|  |  | Penalty |
| Year | Deficiency | Sec. 6662(a) |
| 1990 | $438,692 | $61,040 |

On November 7, 1994, the Paus filed a petition with this Court.  An answer was filed on December 20, 1994, in which

respondent asserted further adjustments to petitioners' 1990 joint return, including: (1) An increase of $195,101 in the deficiency in income tax set forth in the original notice; and (2) an addition to tax of $373,731 under the civil fraud penalty of section 6663 or, alternatively, an increased penalty pursuant to section 6662(a) of $99,662.[1]

After concessions, two issues remain regarding petitioners' income tax liability for 1990: (1) Whether petitioners are liable for the penalty pursuant to section 6663 for failure to report $990,000 of income with the intent of evading the payment of Federal income tax. We hold they are. (2) Whether section 163(h)(3) limits petitioners' Schedule A deduction for home mortgage interest to interest paid on acquisition debt of $1 million. We hold it does.

## FINDINGS OF FACT

The parties have stipulated to some of the facts and the Court has so found. The stipulation of facts and accompanying exhibits are incorporated herein. Peter S. Pau (petitioner) and Susanna H. Pau (Susanna) were married and resided in Hillsborough, California, at the time they filed their petition in this case.

---

[1] All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

I.  The Unreported Income

During 1990, and at all relevant times before and after that year, the Paus operated a real estate development, management, and brokerage business as sole proprietors doing business as d.b.a. Sand Hill Property Co. (Sand Hill).  Petitioner was actively engaged in the real estate management and development side of the business; Susanna was largely concerned with commercial real estate purchases and sales.  Susanna generally dealt with major commercial properties, and most of her clients hailed from Hong Kong and Japan.  Despite separate roles in Sand Hill, petitioners worked together and were aware of each other's transactions.

Petitioner began working as a developer in 1979, having earned a bachelor's degree in civil engineering from the University of California at Berkeley in 1975 and a master's degree in construction management from Stanford University in 1976.  Susanna earned a bachelor's degree in business administration and accounting from the University of California at Berkeley in 1974.

A.  The Stockton Street Property Transaction

In March of 1990, Susanna brokered the sale of real property located at 39 Stockton Street in San Francisco, California (the Stockton Street property).  Meiyan Enterprises, Inc. (Meiyan), sold the property to Sanrio, Inc. (Sanrio), a Japanese company, for use as a retail outlet.  The sale generated a broker's

commission of $250,000, which was paid to Sand Hill at the time of the closing on March 15, 1990. Payment was made by a check drawn on the escrow account by Founders Title Co.; the check was deposited in full in Sand Hill's business checking account at the Bank of America (the Bank of America account). The $250,000 commission was included in the total gross receipts reported on petitioners' 1990 Schedules C.

In addition to the broker's commission, on March 20, 1990, Meiyan paid Susanna a $150,000 finder's fee for locating the buyer of the Stockton Street property. The payment was made by a check in Sand Hill's name bearing the handwritten notation "consultation fee". Susanna deposited the check in full into the Bank of America account on March 20, 1990.

B. The Eccles Avenue Property Transaction

Beginning in March of 1990, petitioner worked with Sanrio on a build-to-suit development deal which evolved into the purchase of an existing building located at 570-586 Eccles Avenue in San Francisco (the Eccles Avenue property). On June 29, 1990, petitioner, d.b.a. Sand Hill, executed a purchase and sale agreement (the agreement) with the seller for the purchase of the Eccles Avenue property. When he signed the agreement, petitioner knew that Sanrio wanted to purchase the Eccles Avenue property for use as its headquarters. Because of a bad business relationship between Sanrio and the seller, petitioner, rather

than Sanrio, signed the agreement so that the seller would not learn that in fact Sanrio was the real buyer.

Sanrio expected to pay a commission to petitioner after it purchased the Eccles Avenue property, because he had acted as its agent.

Petitioner expressed some concern after the deal shifted from development to purchase as to how he would be remunerated for his work for Sanrio. On June 12, 1990 (before he signed the purchase agreement), petitioner sent a letter to Sanrio detailing his negotiations for Sanrio's purchase of the property. As of that date, petitioner expected to receive $840,000 (representing 3 percent of the purchase price) from Sanrio upon its purchase of the property. Additionally, while petitioner worked for Sanrio to buy the property, he had incurred expenses for inspectors and engineers. In September of 1990, Sanrio reimbursed him for his out-of-pocket expenses. On October 30, 1990, Sanrio paid $840,000 to petitioners in consideration of the assignment of petitioner's rights d.b.a. Sand Hill as purchaser of the Eccles property.

The payment was made as follows: on October 30, 1990, at Susanna's request, Sanrio directed the Bank of California to debit its account there by $840,000 and remit the sum by electronic funds transfer to the account of Susanna Pau at the Banque Nationale de Paris (BNP) branch located in San Francisco, California (the BNP account). On that same date, Susanna

directed BNP to transfer $100,000 of the $840,000 to the Bank of America account. Sanrio mistakenly failed to issue a Form 1099 to petitioner for its payment of $840,000, because the payment was made via a wire transfer rather than through its accounts payable system. Petitioners and Sanrio never discussed the issuance of a Form 1099 upon the completion of the transaction.

The BNP account was an interest-bearing account from which Susanna periodically transferred funds to the Bank of America account or to a checking account maintained at the Bank of the West. Except for the $840,000 from Sanrio, petitioners did not deposit any other business income directly into the BNP account in 1990; all other deposits in BNP were transfers from other accounts held by petitioners.

C. Petitioners' Recordkeeping Methods

Despite Susanna's accounting background, petitioner is Sand Hill's bookkeeper. He alone possessed signature authority over the Bank of America account. Petitioners used that account to deposit their commission checks, management fees, and reimbursed expenses. Whenever the Bank of America account held a particularly large balance, petitioner would transfer funds via check into other accounts, especially the BNP account, for the purpose of accruing greater interest. Petitioner claimed that when he wrote checks on the Bank of America account for deposit into another account, he did not verify that it contained

sufficient funds to cover the checks because there was always a large balance.

Business income and expenses for Sand Hill during 1990 were evenly apportioned between petitioner and Susanna and reported on two separate Schedules C attached to their 1990 return. To track expenses incurred by petitioners on Sand Hill's behalf, petitioner used the check register which showed the various types and amounts of expenses. Petitioner did not keep copies of bank deposit slips and did not record the sources of the deposits, although he did have access to monthly bank statements. When petitioner was ready to file the income tax return for himself and Susanna, he simply resorted to his memory to determine what transactions took place, since Susanna engaged in very few transactions on a yearly basis which generated commissions. Petitioner did not consult with Susanna to verify her income, nor did he search Sand Hill's files. For miscellaneous income, including interest from banks and brokerage firms, petitioner relied on Forms 1099.

For petitioners' Federal income tax returns, including the 1990 return, petitioner then prepared a one-page summary of Sand Hill's income and expenses on his computer and gave it to petitioners' accountant. The accountant used the summary to prepare the Paus' tax returns. The one-page summary is the only record petitioner gave to the accountant. In the summary,

petitioner listed expenses in categories such as travel, telephone, and office rent.  For income, he listed three sources: Commissions earned by Susanna, management income he earned, and miscellaneous income.  In 1990, Susanna earned commissions from four transactions, and petitioners reported the income on their Schedules C.  Sand Hill received these commission checks generally through escrow accounts, and petitioners deposited the checks into various bank accounts, including the Bank of America account.

Petitioner did not include Susanna's consultation fee as income on the one-page summary of Sand Hill's income and expenses prepared for the Paus' accountant, even though he knew that she had received $150,000 as a consultation fee from Meiyan. Moreover, the same day Susanna deposited the check for $150,000 into the Bank of America account, petitioner wrote a check on that account payable to Susanna for the same amount, which she deposited into the BNP account.  Another check for $50,000 was also debited on March 20, 1990.  Prior to the deposit of the $150,000, the account contained a balance of $155,874.47.  In completing Sand Hill's 1990 income and expense summary for petitioners' accountant, petitioner was aware of but intentionally failed to include the $840,000 from Sanrio.

Petitioners did not tell their accountant of either omission from their summary.  Neither the $150,000 fee nor the $840,000

from Sanrio was reported on the Schedules C attached to petitioners' 1990 return.

D.  Petitioners' Explanation of Unreported Sanrio Income

From 1978 to 1984 petitioners lived in Boise, Idaho, where they engaged in real estate transactions.  In 1983, they acquired an interest in Regent Properties (Regent), a 40-acre real estate development in Boise.  In 1984, petitioners stopped paying equity into Regent, which had generated losses for them.  Since then, they have not been actively involved in the property.  At trial, petitioner was unaware of Regent's status, although the Paus still held their interest in it.

Since 1986, petitioners had wanted to take advantage of projected losses from Regent but had been unsuccessful, because their ordinary income could not be applied against capital losses from the property.  Petitioner hoped to treat the $840,000 as a capital gain and to apply $300,000 to $350,000 of capital losses from Regent against it if and when such losses were realized.  Petitioners deliberately did not report the $840,000 of income from Sanrio on their 1990 income tax return, because they wanted to wait until the losses were realized, in order to report the income and the losses simultaneously.  Therefore, they thought it would be easier to file an amended return to report the additional income, rather than to report it on the original return for 1990 and later file an amended return to claim a large refund.

Petitioners never did file an amended return.

Petitioners did not consult a certified public accountant or a tax attorney with respect to the tax treatment of the income from Sanrio and losses from Regent. However, they did ask an accountant about the extent of their mortgage interest deduction and about amending their return to claim an additional deduction.

E. The Audit Process

Richard Clement (Clement) is respondent's revenue agent responsible for the audit of petitioners' 1990 Federal income tax return. He is familiar with real estate practices in the San Francisco Bay area and has conducted audits of companies engaged in real estate transactions.

In July of 1994, Clement examined the Federal income tax return filed by Sanrio. While auditing this return, he noticed Sanrio's $840,000 payment by wire transfer to Susanna's account at BNP. Accordingly, he requested an RTVUE, which is a computer-generated document showing certain types of information from a tax return (such as gross receipts reported on a Schedule C). Using the RTVUE, Clement discovered that the Paus had reported gross receipts on their 1990 Schedules C in an amount less than the $840,000 transfer reflected on Sanrio's return.

After reviewing the Paus' 1990 return, Clement decided to audit it. He selected for examination gross receipts and expenses from the Schedules C, and Schedule A deductions for home mortgage interest and contributions. Clement left several

messages on the Paus' telephone answering machine upon commencing the audit. He left the initial message on July 13, 1994. Clement spoke with Susanna for the first and only time on July 18, 1994. During that conversation, Clement told Susanna that petitioners' 1990 return had been selected for audit and that he wished to arrange an appointment with them. A meeting was scheduled for July 25, 1994. On July 19, 1994, Susanna left Clement a message on his answering machine canceling the appointment and rescheduling it for July 27, 1994.

On July 25, 1994, Clement and petitioner spoke by telephone. At that time, Clement asked petitioners to sign a consent form to extend the period of limitations (Form 872) for their 1990 return, because the period was to expire on August 15, 1994. Petitioners refused to execute the Form 872. Petitioner erroneously told Clement that the Paus had filed their 1990 tax return in June or July of 1991, so that the period had already run.

Clement and petitioner engaged in another telephone conversation on July 26, 1994, during which Clement again sought the Paus' consent to extend the period of limitations. Petitioner told the agent that his accountant had advised him that the period had expired; he also indicated, without elaborating, that the gross receipts reported on petitioners' 1990 return might have been incorrect. They discussed their

meeting set for July 27, 1994. However, petitioners and Clement never met that day or at any other time prior to October 31, 1995, although they did have a telephone conversation on August 1, 1994. Clement and petitioner discussed the receipt of the $840,000 from Sanrio. Petitioner did not provide a direct answer to Clement's inquiry about this sum. This conversation was Clement's last personal contact with either petitioner before respondent issued the notice of deficiency.

On August 2, 1994 petitioner left a voice message for Clement, informing him that petitioners had received an appointment letter, a Form 872, and an information document request (IDR) seeking books and records needed to audit the return. Petitioner once again stated that the Paus would not extend the period and that they would be unable to obtain the documents requested because of the short time left in the period. Clement then served a summons on petitioners on August 5, 1994, for the records identified in the IDR. Prior to the issuance of the notice of deficiency, the Paus did not produce any books and records requested from them by the IDR.

In addition to the summons served on petitioners, Clement issued summonses to financial institutions and a title company. He received the books and records from these entities after the notice of deficiency had been mailed to petitioners.

On August 5, 1994, Susanna informed Clement's manager that petitioners had retained counsel. However, as of August 10, 1994, Clement had not received a power of attorney from petitioners, and he therefore could not discuss the Paus' tax matters with another individual. A power of attorney was not received until after Clement prepared the notice of deficiency and forwarded petitioners' file on August 10, 1994, to the office responsible for mailing such notices.

The notice of deficiency was issued on August 11, 1994, and increased petitioners' Schedule C income for 1990 by $545,000 each, for a combined increase in their taxable income of $1,090,000, as a result of the $840,000 income from Sanrio and the $250,000 commission from the sale of the Stockton Street property. (That commission had in fact been reported.) Respondent also disallowed a total of $334,073 in Schedule C expenses and $132,261 in itemized deductions.

Clement learned of Susanna's $150,000 consultation fee only after receiving a copy of the canceled check pursuant to the summons served upon the Bank of America. Neither Susanna nor petitioner explained to Clement why they had not reported the consultation fee on their return.

After Clement notified petitioners of the audit, petitioner prepared a bank deposits analysis to show the transfer of funds between and among petitioners' various accounts. Petitioner did

not give this analysis to Clement.  Among the records petitioner used to reconstruct Sand Hill's income were monthly statements from its Bank of America account.

On October 31, 1995, Clement met with petitioner and his accountant to review records for Sand Hill's expenses and petitioners' deductions disallowed in the notice of deficiency. For recording Sand Hill's expenses, petitioner used a spiral-bound notebook with accounting paper.  Using this notebook, petitioner verified each and every expense paid by Sand Hill for which deductions were claimed by petitioners on their Schedules C.  Clement determined that petitioner kept the notebook in the ordinary course of business during 1990 and that it was an adequate record for petitioners' business.  Petitioner, however, did not present records of Sand Hill's income to Clement, so the agent used petitioners' bank records to analyze deposits and transfers to reconstruct Sand Hill's income.

In their petition, the Paus denied that they had received income of $840,000 that they did not report on their 1990 return. Respondent's answer asserted that petitioners failed to report additional Schedule C income of $616,789, including the $150,000 consultation fee received by Susanna.  Respondent further asserted that the underpayment of petitioners' tax for 1990 attributable to their unreported income was due to fraud, and that any deficiency stemming from that income is subject to the

penalty under section 6663.  Petitioners' reply denied receipt of the $150,000.

The parties have since stipulated that petitioners omitted only the following items of income from their Schedules C attached to their 1990 return:  (1) The consultation fee of $150,000 paid to Susanna d.b.a. Sand Hill on March 20, 1990, by Meiyan; and (2) the sum of $840,000 paid to petitioners on October 30, 1990, by Sanrio.  The parties agree that section 6662(a) applies to the deficiency attributable to the unreported income to the extent that the Court concludes that section 6663 is inapplicable.

## II.  The Mortgage Interest Deduction

Until 1989, petitioners owned a condominium in San Mateo, California, that they used as their primary residence.  In 1989, after their move, petitioners subsequently reclassified the condominium as rental property.  In that year, petitioners also purchased a home in Hillsborough, California, for use as their primary residence and they have since lived there at all times. The purchase price of the residence was $1,780,000.  Petitioners have a mortgage on the Hillsborough residence, the original principal amount of which was $1,330,000.

In 1990, petitioners claimed a home mortgage interest deduction on Schedule A of $107,226.  Despite having actually paid a greater amount of mortgage interest, petitioners limited

their deduction to interest on $1.1 million indebtedness based on advice from an accountant. In her notice of deficiency, respondent completely disallowed petitioners' Schedule A deduction for home mortgage interest.

As a result of the October 31, 1995, meeting with petitioner, Clement allowed the Paus a home mortgage interest deduction, but he limited the allowable deduction to the interest on $1 million indebtedness. Consequently, he calculated that the allowable deduction is $99,040 rather than the $107,226 claimed by petitioners, a difference of $8,186. Clement also increased the Schedule A deduction for personal interest by $819, from $4,210 to $5,029.

## OPINION

As a general rule, the Commissioner's determinations are presumed correct, and taxpayers bear the burden of proving that those determinations are erroneous. Accordingly, with respect to deficiencies flowing from the home mortgage interest deduction and the $840,000 omission, petitioners have the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Since the $150,000 omission was asserted by respondent after the notice of deficiency was mailed, it is new matter on which respondent bears the burden. Rule 142(a). Respondent also bears the burden of proving, by clear and convincing evidence, that petitioners are liable for the civil fraud penalty. Sec. 7454(a); Rule 142(b).

Issue 1. Penalty Pursuant to Section 6663

Section 6663 provides for a penalty equal to 75 percent of the underpayment of tax attributable to fraud. Sec. 6663(a). For section 6663 to apply, respondent must show that: (1) An underpayment of tax exists for the period at issue, and (2) a portion of the underpayment stems from fraud. Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). The mere failure to report income generally is not sufficient to establish fraud. Switzer v. Commissioner, 20 T.C. 759, 765 (1953).

A. Underpayment of Tax

There is no question that petitioners underpaid their tax due for 1990, given their admission that they did not report income of $990,000 on their return. Thus, we may proceed with the second prong of the analysis. See Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992).

B. Fraudulent Intent

Fraud is intentional wrongdoing on the part of the taxpayer with the specific purpose of evading a tax believed to be owing. Petzoldt v. Commissioner, supra at 698; McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The existence of fraud is a question of fact to be resolved from the entire record. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992); Gajewski v. Commissioner,

67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Direct proof of intent is rarely available, so courts may look to circumstantial evidence and draw reasonable inferences from the facts.  Spies v. United States, 317 U.S. 492 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.  Fraud must be affirmatively established and is never imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970).

For the Commissioner to carry her burden of proving that the underpayment of tax is attributable to fraud, she must show that a taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes.  Powell v. Granquist, 252 F.2d 56, 60-61 (9th Cir. 1958); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  A taxpayer's entire course of conduct can be indicative of fraud.  Stone v. Commissioner, 56 T.C. 213, 224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include:  (1) Understating income, (2) keeping inadequate records, (3) offering implausible or inconsistent explanations of behavior, (4) concealing assets, and (5) failing to cooperate with the Commissioner's agent.  See Bradford v. Commissioner, supra at 303, and cases cited therein; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988).  Although no single factor necessarily suffices to establish fraud, a confluence of factors constitutes

persuasive evidence.  Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.  Some conduct and evidence can be classified under more than one factor.  A taxpayer's intelligence, education, and tax expertise are also relevant in determining fraudulent intent.  See Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Iley v. Commissioner, 19 T.C. 631, 635 (1952).

Applying the aforementioned criteria, as set out below, we conclude that petitioners underreported their income for 1990 with the intention to evade income tax on $990,000 and are therefore liable for a penalty under section 6663.

1.  Understatement of Income

Petitioners assert that they are not liable for the civil fraud penalty because there is no "pattern of underreporting" income.  Respondent acknowledges that the evidence does not demonstrate such a pattern.  Nevertheless, she contends that a pattern of underreporting is not a sine qua non for the imposition of the civil fraud penalty.

We agree with respondent that she may assert such a penalty where a taxpayer fails to report income, even for only 1 year, with the intention of evading tax due on that income.  In Mitchell v. Commissioner, T.C. Memo. 1994-242, the Court examined facts relating to a corporate taxpayer and an officer.  Acting for the corporation, the officer sold its airplane and diverted the sales proceeds to a Swiss bank account.  Neither the

corporation nor the officer reported income from the sale of the airplane or the diversion of the sale proceeds. We held both taxpayers were liable for the civil fraud penalty, because they failed to report the income with the intention of evading Federal income tax. In Mitchell, as in the case before us, the taxpayers' conduct occurred in only 1 year, and the conduct related to a single transaction. See also Taylor v. Commissioner, T.C. Memo. 1993-546.

Petitioners cite Stone v. Commissioner, 22 T.C. 893 (1954), arguing that respondent cannot establish fraud in reliance on unreported income for 1 year. However, that case does not stand for such a broad proposition. Rather, in Stone, we held that, without more, a gross understatement of income in 1 year did not establish that "there was fraud with intent to evade tax in this instance." Id. at 904 (emphasis added). In the case before us, respondent relied on a number of factors to prove fraud, as shown below.

2. Inadequacy of Books and Records

In October of 1995, petitioner met with Clement for the first time, presenting Sand Hill's records of expenses to establish petitioners' entitlement to deductions claimed on their Schedules C. Clement found the records adequate to verify each and every expense claimed for Sand Hill. However, petitioner presented no records for Sand Hill's income and conceded that his handling of the income of Sand Hill was entirely inadequate.

The inadequacy of the records was not due to negligence on the part of petitioners, but fraud. Petitioners' reliance on Tabbi v. Commissioner, T.C. Memo. 1995-463, is misplaced. In that case, the Court held that the taxpayer was not liable for the civil fraud penalty, in part because his failure to keep books and records, other than checks, was due to the fact that he was "disorganized and because he could not afford accountants." Id. Other factors also weighed in his favor. In the instant case, petitioners present only their self-serving testimony that they were disorganized, which we do not find credible. Petitioners were able to prove every expense they had claimed for Sand Hill. They also had ready access to monthly bank statements and the ability to use them, which petitioner showed in conducting his deposits analysis. Even more telling, petitioners could afford and did use an accountant but intentionally failed to provide him with accurate records. See Korecky v. Commissioner, 781 F.2d 1566, 1568-1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Merritt v. Commissioner, 301 F.2d 484, 486-487 (5th Cir. 1962), affg. T.C. Memo. 1959-172.

3. Implausible or Inconsistent Explanations of Behavior

Petitioners refused to acknowledge their receipt of the $840,000 from Sanrio until after respondent's answer, even though petitioner earlier had mentioned a potential problem with the gross receipts reported on the return, and despite the fact that the $840,000 was specifically brought up in their conversation with Clement on August 1, 1994. Petitioner subsequently stated

that he failed to report the income, not to evade tax, but because he viewed the payment as a short-term capital gain which he intended to offset by capital losses from his interest in Regent when such losses were realized. The Court discounts this explanation as an afterthought. See Gajewski v. Commissioner, 67 T.C. at 202. Petitioner had at least two clear opportunities to offer this explanation to Clement before petitioners retained counsel, yet he said nothing.

Even if we did not regard petitioner's explanation as a recent fabrication, we find highly improbable his testimony that he viewed the income received from Sanrio as capital, rather than ordinary, in nature. Although his wife usually engaged in brokerage sales for Sand Hill, petitioner was familiar with real estate practices. The evidence overwhelmingly suggests that Sanrio viewed petitioner merely as an agent, and that petitioner knew of his role as intermediary. Petitioner wrote a letter to Sanrio before the Agreement was signed describing his fee. Moreover, Sanrio reimbursed petitioner for his out-of-pocket expenses. Petitioner signed the agreement, rather than Sanrio, due to the seller's antipathy toward Sanrio. Cf. Solomon v. Commissioner, 732 F.2d at 1461. Consequently, petitioner must have known that the $840,000 was a commission and therefore ordinary income against which, he was aware, capital losses could not be applied. His explanation is incongruous with these circumstances.

Moreover, even if the payment from Sanrio could have been characterized as a capital gain rather than ordinary income, section 441 requires a taxpayer to report taxable income on the basis of a taxable year. Petitioners had an obligation to report the $840,000 on their 1990 return, not in the future when they might possibly realize a capital loss. Petitioners surely recognized that duty in light of their relative sophistication in tax matters; they were aware that their capital losses could be carried forward and that they could have received a refund. Furthermore, Susanna held a bachelor's degree in accounting. Cf. Laurins v. Commissioner, 889 F.2d at 913 (the fact that a taxpayer is sophisticated in tax matters may permit an inference of intent to defraud when he willfully underpays his taxes). Finally, there is no evidence in the record before us that petitioners realized their losses in Regent at any time from 1990 until the date of trial. Petitioner himself stated that he did not know when, if ever, the losses from Regent would be realized. This indicates to us that, had petitioners not been audited, the $840,000 income would never have been disclosed.

Petitioner's claim that the omission of Susanna's $150,000 consultation fee was inadvertent also rings false. Susanna had engaged in only a handful of transactions that year, and she testified that petitioner was aware of her transactions and of the consultation fee. Moreover, petitioner wrote a check to Susanna drawn on the Bank of America account for that exact amount on the same day the consultation fee was deposited in that

account, which accords with petitioners' stated practice of transferring large sums of money from their business accounts to the BNP account to earn greater interest. Finally, contrary to petitioner's testimony, monthly bank statements reveal that the Bank of America account did not always carry a large balance. Petitioner must have known of the additional income because otherwise, given the outstanding checks he had written on that account and its prior balance of only $155,874.47, he would have overdrawn the account by almost $45,000.

4. <u>Attempts To Conceal Assets</u>

Susanna instructed Sanrio to pay $840,000 by wire transfer into her nonbusiness account at BNP. This was the only direct business deposit into that account in 1990. Sanrio did not issue a Form 1099 for its payment, an error on its part because of the method of payment. However, petitioners did not request a Form 1099, despite petitioner's knowledge of the existence of such a form and his reliance on it in other instances to verify interest and miscellaneous income.

Furthermore, although petitioners consulted an accountant about the limit to their home mortgage interest deduction and about amending their return to increase another deduction, they did not discuss applying unrealized capital losses against the $840,000 with an accountant. In fact, they concealed that income completely from their tax preparer. Case law is replete with support for holding that petitioners may be liable for the civil fraud penalty as a result of such an action. See <u>Korecky v.</u>

Commissioner, 781 F.2d at 1568; Paschal v. Commissioner, T.C. Memo. 1994-380, affd. 76 AFTR2d 95-7975, 96-1 USTC par. 50,013 (3d Cir. 1995); Morris v. Commissioner, T.C. Memo. 1992-635, affd. without published opinion 15 F.3d 1079 (5th Cir. 1994); cf. Ross Glove Co. v. Commissioner, 60 T.C. 569, 608 (1973) (no fraud demonstrated where evidence did not show the taxpayer ignored or misinformed his attorneys or accountants); Marinzulich v. Commissioner, 31 T.C. 487, 492 (1958) (no fraud proven where the taxpayers' accountant had complete access to all the information bearing on their tax liability); Dagon v. Commissioner, T.C. Memo. 1984-138 (no fraud where the taxpayer did not conceal any records from his tax return preparer); Compton v. Commissioner, T.C. Memo. 1983-647 (no fraud where the taxpayer turned over sufficient records to his tax preparer for her to accurately determine his tax liability for the years in issue). We agree with respondent that the only rationale for petitioners' failure to disclose the income to the accountant was so that they could avoid the accountant's duty to report the income.

5. Failure To Cooperate

Petitioners did not cooperate with respondent's agent initially, canceling appointments, refusing to extend the period of limitations, and failing to produce records and books used to prepare their Schedules C and their tax return. Using the limited information available to him, the agent prepared, and respondent issued, the notice of deficiency to petitioners. Cf.

Dagon v. Commissioner, supra (no fraud where the taxpayer met with the Commissioner's agent several times during the course of criminal investigation and gave the agent all books and records, explained procedures followed in preparation of those records, and provided complete access to personal banking records). Only after counsel was retained did petitioners cooperate with respondent's agent, which of course does not rectify their previous intransigence. Cf. Badaracco v. Commissioner, 464 U.S. 386, 394 (1984).

6. Petitioners' Sophistication and Experience

Petitioners seek to portray themselves as tax naifs who operated a "mom-and-pop" business. They rely on Cheek v. United States, 498 U.S. 192 (1991), in arguing that a good faith misunderstanding of the tax law may negate fraud. However, petitioners' own testimony clearly belies their assertions of inexperience and good faith. Petitioners are both well-educated, adept business people who have successfully cultivated an international clientele. Susanna has a degree in accounting. At trial, petitioner demonstrated an awareness of capital loss carryforwards; he knew that the general statute of limitations for tax returns was 3 years, and that taxpayers could amend their tax returns at any time to report additional income. Moreover, he knew how to structure business ventures in a tax-advantaged manner. Their experience reveals that petitioners understood the

tax laws but chose to ignore them in their effort to evade the payment of income tax.

Thus, we find that respondent has clearly and convincingly proven fraud on the part of petitioners for both items of unreported income for the year in issue, and we so hold. Our conclusion is premised on the record as a whole and reasonable inferences therefrom, taking into account our determination as to the credibility of petitioners and the other witnesses presented at trial. Therefore, we sustain respondent's determination that petitioners are liable for the penalty for 1990 pursuant to section 6663.

## Issue 2. Section 163(h)(3) Restriction on Home Mortgage Interest Deduction

Section 163(a) states the general rule for deductions for interest paid or incurred on indebtedness within the taxable year. Other provisions of section 163 limit such deductions. Section 163(h) disallows personal interest deductions unless they fit within certain narrowly prescribed categories. Among these narrow exceptions is the deduction for interest on a qualified residence. Sec. 163(h)(2)(D). The parties agree that the interest paid on the mortgage for petitioners' home was qualified residence interest, because the Paus paid it on acquisition indebtedness pursuant to section 163(h)(3)(A)(i) and (B)(i). The parties dispute only the amount of acquisition indebtedness petitioners may use in computing their deduction.

Section 163(h) restricts home mortgage interest deductions to interest paid on $1 million of acquisition indebtedness for debt incurred after October 13, 1987. Acquisition indebtedness is defined as that which is "incurred in acquiring, constructing, or substantially improving any qualified residence of the taxpayer, and * * * is secured by such residence." Sec. 163(h)(3)(B). A taxpayer may be entitled to a greater deduction if he has incurred home equity indebtedness up to $100,000, as allowed by section 163(h)(3)(C)(ii). There can be no additional deduction where taxpayers fail to show that they had home equity indebtedness. See Notice 88-74, 1988-2 C.B. 385. Home equity indebtedness is defined as "any indebtedness (<u>other than acquisition indebtedness</u>) secured by a qualified residence". Sec. 163(h)(3)(C) (emphasis added).

Petitioners, who purchased their home in 1989, did not demonstrate that any of their debt was not incurred in acquiring, constructing or substantially improving their residence and thus have failed to carry their burden of proof. We therefore sustain respondent's determination as to the amount petitioners may properly deduct for home mortgage interest.

To reflect the foregoing and issues previously resolved,

<u>Decision will be entered</u>

<u>under Rule 155</u>.